UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. PIERCE DIVISION

UNITED STATES OF
AMERICA,
    Plaintiff,
v.                                      CASE NO.: 2:23CR14015-JEM-2

KAREN DAYANA
BERMUDEZ-TORRES, et. al.,
    Defendant.
_____/

**DEFENDANT'S SENTENCING MEMORANDUM & INCORPORATED MOTION FOR DEPARTURE AND/OR DOWNWARD VARIANCE FROM THE GUIDELINE RANGE**

COMES NOW, the Defendant Karen Dayana Bermudez-Torres ("Ms. Bermudez-Torres") by and through the undersigned counsel, and pursuant to 18 U.S.C. § 3553(a) sets forth this memorandum, in support of her plea for a reasonable sentence, which is no greater than necessary to serve the stated goals of the Sentencing Commission, and incorporated Motion for Variance and/or Departure from the stated advisory guideline range, and in support states as follows:

**FACTUAL UNDERPINNINGS & PROCEDURAL HISTORY**

1. On April 6, 2023, Ms. Bermudez-Torres was indicted in Count 1, 2, and 4-7. [DE3].

2. More specifically, in Count one, Ms. Bermudez-Torres was accused of conspiring to distribute a controlled substance beginning in or about October of 2022, and continuing through December of 2022. [DE3:1]. In Counts two, four, five, six, and seven, Ms. Bermudez-Torres was accused of distributing a controlled substance on October 26 and November 5 and 16, and December 2 and 8, of 2022. [DE3:2-4].

3. On July 26, 2023, Ms. Bermudez-Torres entered into a plea agreement with the United States of America (the "Government"). [DE67].

1

4. Pursuant to the plea, Ms. Bermudez-Torres pled guilty to Count 1, 4, 5, and 7 of the Indictment. [DE67:1]. The Government agreed to seek dismissal of Count 2 and 6 of the Indictment. [DE67:1].

5. The factual proffer in support of the plea agreement indicates that in or about July of 2022, the Indian River County Sherrif's Office ("IRCSO") initiated a sting operation with respect to drug trafficking in the area. [DE68:1-2]. In furtherance of its operation, IRCSO along with the Drug Enforcement Administration ("DEA"), utilized an under-cover detective ("UC") to engage in controlled purchases of narcotics. [DE68:2]. In early October of 2022, the UC received an unsolicited message from co-defendant Lakeshia Denise Blackshell ("Blackshell") offering suspected narcotics. [DE68:2].

6. Blackshell directed the UC to meet her at McDonald's and delivered 90.9 grams of methamphetamine at that location. [DE68:2]. Ms. Bermudez-Torres was driving the vehicle during this delivery. [DE68:2].

7. On November 5, 2022, Ms. Bermudez-Torres agreed to sell six ounces of methamphetamine to the UC and met the UC at McDonalds. [DE68:2-3]. Thereafter, Ms. Bermudez-Torres delivered 160.2 grams of methamphetamine to the UC, after conferring with co-defendant Montravious Deon Stuckey ("Stuckey"). [DE68:2].

8. On November 16, 2022, Ms. Bermudez-Torres agreed to sell six ounces of methamphetamine to the UC, once again. [DE68:4]. This sale occurred at the Howard Johnson hotel, and again after receiving controlled substance from Stuckey, Ms. Bermudez-Torres delivered 149.8 grams of methamphetamine to the UC. [DE68:4].

9. On December 2, 2022, Ms. Bermudez-Torres again sold methamphetamine (162.2 grams) to the UC. [DE68:4-5]. On December 8, 2022, Ms. Bermudez-Torres introduced the UC to

a new supply source and delivered 28.8 grams of methamphetamine, and thereafter an additional 132.5 grams of methamphetamine to the UC. [DE68:5].

10. Ms. Bermudez-Torres pled guilty on July 26, 2023 [DE69], which was accepted on August 15, 2023 [DE76].

11. Co-defendants Stuckey and Blackshell each have pleaded guilty and are awaiting sentencing. [DE78] [DE62].

## MS. BERMUDEZ-TORRES

12. Ms. Bermudez-Torres was born in Puerto Rico, to a teenage mother, and an absentee father. [DE84 ¶ 71].

13. Ms. Bermudez-Torres' mother abandoned her as an infant, to reside in New York (hundreds of miles away), leaving Ms. Bermudez-Torres in the care of relatives. [DE84 ¶ 72]. Ms. Bermudez-Torres, however, was the victim of sexual abuse by her family members, which abuse was discovered when Ms. Bermudez-Torres was just six years old. [DE84 ¶ 72].

14. Ms. Bermudez-Torres' mother reappeared after becoming aware of the sexual abuse, and Ms. Bermudez-Torres moved to New York with her mother at age thirteen. [DE84 ¶ 72].

15. Ms. Bermudez-Torres was in a tumultuous relationship as a teenager, which resulted in her own pregnancy at sixteen years old. [DE84 ¶ 73]. In this relationship, her son's father dealt drugs, and forced Ms. Bermudez-Torres to use cocaine. [DE84 ¶ 73].

16. Ms. Bermudez-Torres had a second child several years later, who was trusted to the care of a family member in Puerto Rico due to Ms. Bermudez-Torres' drug addiction. [DE84 ¶ 73].

17. Years after, Ms. Bermudez-Torres gave birth to her youngest son (now, age thirteen). [DE84 ¶ 73]. Her youngest son's father was physically abusive and was murdered just days after the child was born. [DE84 ¶ 73].

18. Ms. Bermudez-Torres' youngest son was born with a heart condition and spent months in the neonatal intensive care unit after his birth. [DE84 ¶ 73]. He has had two prior heart surgeries and is presently on the waiting list to receive a heart transplant. [DE84 ¶ 73].

19. It is unclear who will care for the youngest child while Ms. Bermudez-Torres serves her term of incarceration in the instant case.

20. Ms. Bermudez-Torres also suffers from several health conditions including type one diabetes (which is treated with insulin); unspecified intestinal obstruction; left bundle-branch block, a left ventricular failure, and epilepsy. [DE84 ¶ 77].

21. Ms. Bermudez-Torres also has a long history of depression and mental health issues, which began when she was just seven years old. [DE84 ¶ 78]. Ms. Bermudez-Torres was Baker Acted in 2017 after she attempted suicide. [DE84 ¶ 78].

22. Furthermore, Ms. Bermudez-Torres has a lengthy history of substance abuse, beginning at age fifteen. [DE84 ¶ 79]. Ms. Bermudez-Torres self-reported that she has not been "clean outside of jail for more than a week" and is typically sober only when incarcerated. [DE84 ¶ 79].

23. Notably, Ms. Bermudez-Torres received substance abuse treatment as a condition of her release in this case, and successfully completed 19 group sessions, and 5 individual sessions and tested negative for illicit substances during June and July of 2023. [DE84 ¶ 79]. However, it has come to the attention of undersigned counsel that on or about September 26, 2023, Ms. Bermudez-Torres was arrested in Indian River County, Florida on unspecified drug charge(s). Chambers has been notified by the parties.

24. As an adult, Ms. Bermudez-Torres has been largely unemployed due to her drug addiction, and the necessity of caring for her son who requires substantial caregiving functions. [DE84 ¶ 83].

25. Ms. Bermudez-Torres also has merger means, receiving social security for her son, food stamps, and with a total net worth of less than two thousand dollars. [DE84:22].

26. Ms. Bermudez-Torres has a total offense level of 31, and a criminal history category of IV which results in a recommended sentencing range between 151 and 188 months. [DE84 ¶ 95].

## **MEMORANDUM OF LAW**

The Court's discretion in sentencing has swung a wide pendulum dating back hundreds of years. In thar regard, "before the Civil War, Congress enacted very few criminal laws and crime control was left largely to the state . . . [which] uniformly followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses." *See United States v. Matchett*, 837 F. 3d 1118, 1119 (11th Cir. 2016). "After the Civil War, this system of fixed sentencing was gradually replaced with individualized sentencing." *Id.* This system, too, however, had its flaws, as the "sentencing powers of the judges were so far unconfined that, except for frequently monstrous maximum statutory limits, they were effectively subject to no law at all." *Id.* at 1120.

To remedy this conundrum "Congress enacted the Sentencing Reform Act of 1984, which created the United States Sentencing Commission and empowered it to promulgate federal sentencing guidelines." *Matchett*, 837 F. 3d at 1120. The initial guidelines promulgated by the committee "were mandatory: district judges were required to impose a sentence within the guideline range, subject to limited departures." *Id.* In *United States v. Booker*, the United States

Supreme Court held that implementation of the guidelines as a mandatory scheme was unconstitutional. 543 U.S. 220, 230 (2005). "To remedy this constitutional defect . . . the *Booker* Court invalidated the statutory provisions that made the guidelines mandatory." *Matchett*, 837 F. 3d at 1121 (citing *Booker*, 543 U.S. at 245).

Now that the guidelines are merely advisory, they "do not and cannot ply a decisive [role in sentencing]." *See Matchett*, 837 F. 3d at 1121. Instead, the guidelines should be the "starting point for sentencing and the lodestar." *Id.* "For that reason, a sentencing court may not apply a presumption of reasonableness to the Guideline range." *See United States v. Burton*, 757 Fed. Appx. 883 (11th Cir. 2018). *See also United States v. Hunt*, 459 F. 3d 1180, 1185 (11th Cir. 2006) (noting that "presumptions are burden-shifting tools" and refusing to ascribe a presumption to the guidelines, instead holding that the "Guidelines are to serve as a starting point for consideration as to whether a given sentence is reasonable in view of the entirety of section 3553(a).").

Ultimately, "[in] arriving at a substantively reasonable sentence, a district court must give consideration to the sentencing factors listed in 18 U.S.C. § 3553(a)." *See United States v. Waite*, 353 Fed. Appx. 293, 294-95 (11th Cir. 2009). These factors include: "the nature and circumstances of the offense"; "the history and characteristics of the offender"; "the need for the sentence imposed to reflect the seriousness of the offense, [] promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence . . . to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care or other corrective treatment"; "the kinds of sentences available"; "the applicable category of offense committed by the applicable category of defendant"; "policy statement[s] issued by the Sentencing Commission"; "the need to avoid unwarranted sentence

disparities among defendants with similar records"; and "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. § 3553(a) (2023).

"The weight accorded to any one § 3553(a) factor is a matter committed to the sound discretion of the district court, and it may attach great weight to one factor over others." *See United States v. Rodriguez*, 853 Fed. Appx. 409, 414 (11th Cir. 2021). *See also United States v. Rosales-Bruno*, 789 F. 3d 1249, 1254 (11th Cir. 2015) ("To arrive at an appropriate sentence, the district court must consider all of the applicable § 3553(a) factors. That does not mean, however, that it must give all the § 3553(a) factors equal weight."). Furthermore, it is well-settled that "[no] limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See* 18 U.S.C. § 3661 (2023). *See also United States v. Arencebia*, 613 Fed. Appx. 882 (11th Cir. 2015) ("In applying the 18 U.S.C. § 3553(a) considerations to craft a sentence, federal law places no limitation on the information which a court can consider in determining an appropriate sentence").

Ultimately, under the advisory guideline scheme, the sentencing court is directed to "make an individualized assessment based on the facts presented, using the guidelines range as the starting point and the initial benchmark." *See United States v. Davis*, 734 Fed. Appx. 718, 724 (11th Cir. 2018). Stated differently, it has been a "uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *See Gall v. United States*, 552 U.S. 38, 52 (2007).

In conducting this review, the district court must strive to arrive at a *reasonable* sentence, which is no greater than necessary to achieve the objectives of the Sentencing Commission. *See*

7

*e.g., United States v. Monje-Maldonado*, 450 Fed. Appx. 832 (11th Cir. 2012) ("The district court is required to impose a sentence sufficient, but not greater than necessary to comply it the purposes listed in 18 U.S.C. § 3553(a)(2)."); *United States v. Garnett*, 564 Fed. Appx. 959 (11th Cir. 2014) ("The boundaries on a district court's broad discretion in sentencing . . . are supplied by statute, which provides that a district court must impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing.").

## I. NATURE OF THE OFFENSE

First, Ms. Bermudez-Torres asserts that this Court should consider the nature and circumstances of the offense in determining a reasonable sentence. In that regard, while undoubtedly serious, Ms. Bermudez-Torres' offense is a nonviolent drug offense. Although at least one count of conviction is alleged as a conspiracy -there is no evidence to suggest that the group engaged in abusive tactics, weapons, violence, coercion, or other dangerous methods in connection to their drug dealing activities. Courts have consistently recognized that the non-violent nature of an offense is a proper consideration in the sentencing calculus. *See e.g., United States v. Davis*, 458 F. 3d 505, 511-12 (6th Cir. 2006); *United States v. Myers*, 2021 U.S. Dist. LEXIS 31333 (D. W. V.A. Feb. 18, 2021) (noting that the conduct at issue was non-violent in determining a proper sentence); *United States v. Restrepo-Hoya*, 2021 U.S. Dist. LEXIS 19699 (S.D. N.Y. Feb. 2, 2201) (discussing § 3553(a) and noting that the non-violent nature of an offense is a proper consideration thereunder); *United States v. Sharpe*, 2008 U.S. LEXIS 7927 (E.D. Penn. Feb. 1, 2008) (indicating that the nonviolent nature of the crime committed was a factor the court should consider in crafting a reasonable sentence); *United States v. Rivera*, 2017 U.S. Dist. LEXIS 39010 (D. N.M. Mar. 17, 2017) (indicating that because the defendant's offense was a nonviolent economic crime, the public would be "protected" by the imposition of a less severe term of incarceration); *United States*

*v. Ferguson*, 456 F. 3d 660, 663-64 (6th Cir. 2006) (noting that the offenses for which the defendant plead were nonviolent in nature, and considering this in the § 3553(a) analysis).

In fact, the Supreme Court has noted that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *See Solem v. Helm*, 463 U.S. 277, 290 (1983). An evaluation of the severity of the offense necessarily involves an inquiry as to whether "violence [or] threat of violence to any person" was associated with the commission of the offense. *Id.* at 296. Offenses which contain no component of violence are "viewed by society as among the less serious offenses." *Id.* As applied here, Ms. Bermudez-Torres recognizes that drug offenses have a severe impact on society and does not in any way downplay the gravity of her conduct in this case. Nevertheless, it is objectively true that drug offenses which contain no violent aspects, threats, weapons, or other similar conduct are less severe in nature. Ms. Bermudez-Torres respectfully submits that the Court should consider the nonviolent nature of her offenses when determining an appropriate sentence in this case.

## II. CHARACTERISTICS OF THE OFFENDER

Next, Ms. Bermudez-Torres respectfully submits that her background and personal characteristics likewise warrant sincere consideration in determining whether downward variance is appropriate in this case.

### A. MS. BERMUDEZ-TORRES'S DIFFICULT UPBRINGING

In evaluating the characteristics of the offender, this Court can and show strongly weigh the difficulty of Ms. Bermudez-Torres's circumstances both as a child and a young adult in crafting a variance sentence. This recognizes a view "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse." *See United States v.*

9

Pickering, 178 F. 3d 1168, 1172 (11th Cir. 1999). *See also Laudigan v. Schiro*, 441 F. 3d 638 (9th Cir. 2006) (finding that when crime results from a disadvantaged background, the defendant is less culpable than one without an excuse); *United States v. Floyd*, 945 F. 2d 1096 (9th Cir. 1991) (affirming a variance based on the defendant's abandonment by his parents and lack of guidance as a youth because these facts rendered him less "culpable" than an ordinary offender).

As noted in detail in the background paragraphs above, Ms. Bermudez-Torres has led a difficult life, which began with abandonment by both mother and father, progressed into a sexually abusive environment by those entrusted to her care, and culminated with dangerous adult relationships and extensive drug abuse. Ms. Bermudez-Torres was abandoned by both her mother and father, one of whom she never met and the other who traveled to another part of the country hundreds of miles away. To make matters worse, the individuals that Ms. Bermudez-Torres trusted and who were entrusted to her care and support ultimately betrayed her. In that respect, Ms. Bermudez-Torres was sexually abused, which undoubtedly caused its own set of mental scars.

Ms. Bermudez-Torres was then reunited with her mother, taken to a new part of the United States, and received inadequate supervision and support. This led to her becoming a teenage mother, and her drug addiction. As an adult Ms. Bermudez-Torres had little chance at a conventionally successful lifestyle, having little or no educational opportunities as a young girl, having moved multiple times, and without any father figure to show her guidance and support. While these facts do not constitute a license to commit criminal activity, they undoubtedly provide an explanation for behavior that would otherwise not have manifested. Ms. Bermudez-Torres submits that this Honorable Court must consider her upbringing and the circumstances of her early life in crafting a reasonable variance sentence.

## B. DRUG ADDICTION AS A GROUNDS FOR VARIANCE, NOT DEPARTURE

In addition, while the Sentencing Guidelines prohibit a downward departure based on drug addiction, "§ 3553(a)(1) compels a sentencing court to take into account the history and characteristics of the defendant. For this reason, it is entirely appropriate to consider a defendant's drug addiction in fashioning an appropriate sentence." *See United States v. Cani*, 454 F. Supp. 2d 1235, 1243 (M.D. Fla. 2008). *See also United States v. Garcia*, 497 F. 3d 964, 972 (9th Cir. 2007) ("We agree with our sister circuits and hold that district courts are not prohibited in all circumstances from considering a defendant's drug addiction in choosing a reasonable sentence.").

In this regard, courts of this Circuit have recognized that where "addiction" rather than "greed" is a strong contributor, or motiving factor, in the offense of conviction, "intensive treatment is more likely than lengthy incarceration to protect the public from future offenses by the afflicted individual." *See United States v. Hicks*, 985 F. Supp. 2d 1307, 1310-11 (M.D. Ala. 2013). As stated by the District Court in *Hicks*, "where crime is fueled by addiction, the addiction sticks deeper, grows with more pernicious roots than the crime itself. Therefore, [sic] treating the addiction is a more effective way to halt the criminal activity than harshly punishing the crime without regard to its broader context." *Id.* at 1311.

As iterated in the presentence investigation report ("PSR") Ms. Bermudez-Torres began her introduction to controlled substances at just the age of fifteen. Thereafter, Ms. Bermudez-Torres was in an abusive relationship which resulted in her pregnancy at age sixteen and likewise involved coercion to engage in illicit drug use. From there, Ms. Bermudez-Torres turned to "harder" drugs, and has not had any lengthy periods of sobriety apart from her forced sobriety while incarcerated. Although Ms. Bermudez-Torres has a long history of drug abuse, she is amenable to treatment, which has been shown by her pattern of conduct while on pre-trial release

in this case. Ms. Bermudez-Torres was required to attend treatment, and complied with these requirements, as a condition of her release, pretrial. Ms. Bermudez-Torres attended group and individual therapy and ultimately tested negative for any controlled substance abuse when tested.

Ms. Bermudez-Torres notes that she has not utilized the proceeds of her criminal activity to live a lavish lifestyle and furnish a large home with lavish goods. On the contrary, Ms. Bermudez-Torres is eligible for and receives food stamps, and otherwise relies on Social Security to support herself and her son. Her net worth is not two thousand dollars, and her bank account is empty. A broader review of the instant case makes clear that this case is "motivated" by addiction, and not greed. Accordingly, in considering the characteristics of the offender, this Court must heavily weigh Ms. Bermudez-Torres's lengthy history of drug addiction, her amenability to treatment, and the appropriate sentence which would best prevent and deter future criminal conduct.

**III.   POLICY STATEMENTS OF THE COMMISSION[1]**

In determining a reasonable sentence, the Commission has expressly made provision for "Family Ties and Responsibilities." U.S.S.G. § 5H1.6 (2023). This provision provides that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." *Id.* However, the commentary to this broad statement provides that such a departure may be warranted after a consideration of (a) the seriousness of the offense; and (b) the involvement in the offense of any family members of the defendant; and (c) the danger, if any, to members of the defendant's family because of the offense. *Id.* at n. 1(A). If these factors to not vitiate the viability of a departure, the court must then determine whether (i) a substantial prison

---

[1] In the presentence investigation report, the author agreed that Ms. Bermudez-Torres may be eligible for a departure based on this provision. [DE84 ¶ 110].

term will "cause a substantial, direct, and specific loss of essential caretaking, or essential financial support" to the defendant's family; and whether this loss or harm "substantially exceeds [that] ordinarily incident to incarceration for a similarly situated defendant." *See* U.S.S.G. § 5H1.6 at n. 1(B).

As applied here, Ms. Bermudez-Torres has a son with a significant disability. As noted above, he has had two major heart surgeries, and at just age thirteen is on the list of individuals who are waiting for a heart transplant. Ms. Bermudez-Torres spends significant time caring for her son, and he requires extensive and specialized treatment. If Ms. Bermudez-Torres is incarcerated for a significant period, it is unclear who will be able to provide support and care for her son. The father of the child was murdered when the child was just an infant, and accordingly, there is no co-parent available to step in, in Ms. Bermudez-Torres' absence. While her family is supportive and seeks to provide additional assistance, the degree of care that is required to provide an adequate environment for the child is high, and it is unknown whether any family member can bear this burden. Ultimately, Ms. Bermudez-Torres is the sole caretaker for her son, who has extraordinary needs above and beyond a typical thirteen-year-old child. Her incarceration will severely and specifically impact her son and place a significant and real burden on her family members to attempt to arrange for his care. For this reason, the Court can depart from the stated guideline range and impose a sentence that is significantly less than the stated guideline range.

## IV.    POLICY STATEMENTS OF THE COMMISSION

Next, Ms. Bermudez-Torres submits that this Court should consider her mental and emotional condition in departing downward from the stated guideline range. U.S.S.G. § 5H1.3 specifically provides that "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other

offender characteristics are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." See U.S.S.G. § 5H1.3 (2023).

As applied here, Ms. Bermudez-Torres has a lengthy history of depression, which dates to her prepubescent years. As recently as 2017 Ms. Bermudez-Torres attempted suicide and was hospitalized pursuant to the Baker Act. Although depression is a common malady which affects thousands of individuals in our country, the circumstances that likely underly Ms. Bermudez-Torres condition are distinct, and present to an "unusual degree". As recounted on numerous occasions above, Ms. Bermudez-Torres was an abandoned child, sexually molested by those on whom she was reliant for care. From these beginnings, Ms. Bermudez-Torres continued a pattern of negative self-image involving herself with physically abusive partners and turning to controlled substances to self-medicate.

Ms. Bermudez-Torres has already begun to treat her substance abuse, as part of her conditions of release in the instant case and has shown success in these endeavors until recently. If Ms. Bermudez-Torres continues dual treatment for her mental health and substance abuse it is much more likely that Ms. Bermudez-Torres will refrain from committing additional offenses. Stated differently, continued treatment for mental health and substance abuse will be a far greater indicator of post-release success than a lengthy term of incarceration, alone.

V. **GUIDELINES ARBITRARY EMPHASIS ON QUALITY & QUANTITY, WITH RESPECT TO METHAMPHETAMINE**

Next, Ms. Bermudez-Torres submits that this Court is permitted to vary from the guidelines based on "solely on its judgment that the policies behind the Guidelines are wrong." *See United States v. Valera*, 622 Fed. Appx. 876 (11th Cir. 2015). *See also United States v. Kimbrough*, 552 U.S. 85, 109-10 (2007) (finding that sentencing courts can vary from the guideline range based on a disagreement with the policy); *United States v. Irey*, 612 F. 3d 1160, 1212 (11th Cir. 2010)

14

("*Kimbrough* allows a district court to vary from the guidelines based solely on its judgment hat the policies behind the guidelines are wrong.").

With respect to methamphetamine offenses, Ms. Bermudez-Torres submits that the methamphetamine guidelines are not based on the Sentencing Commission's empirical research or expertise, but "rather are the vestige of mandatory-minimum sentencing laws [and] . . . impose unduly harsh sentences premised on the mistaken idea that the higher the quantity and purity of drugs involved in the crime, the higher the defendant's position in the drug trade." *See United States v. Johnson*, 379 F. Supp. 3d 1213 (M.D. Ala. 2019). In *Johnson*, a district court sitting in the middle district of Alabama recognized that "several district courts have granted variance at least in part because the drug-trafficking guidelines are not rooted in empirical evidence." *Id.* at 1218 (citing *United States v. Diaz*, 2013 U.S. Dist. LEXIS 11386 (E.D. N.Y. Jan. 28, 2013); *United States v. Hayes*, 948 F. Supp. 2d 1009, 1027 (N.D. Iowa 2013); *United States v. Castellanos*, 2008 U.S. Dist. ELXIS 106140 (D. Neb. Dec. 29, 2008); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1252 (D. N.M. 2017)).

Additionally, because the "Commission did not exercise its characteristic institutional role in developing the methamphetamine guidelines, this Court has greater latitude to make a downward variance based on policy disagreements with them." *Johnson*, 279 F. Supp. 3d at 1220. With respect to the "**quantity**", U.S.S.G. § 2D1.1(c) sets forth a "drug quantity table" under which the "greater the quantity of drugs, the higher the base-offense level and thus sentencing range." *Id.* For years, commentators have challenged this scheme, and demanded a "fundamental re-examination of the role of quantity under the guidelines." *Id.* Furthermore, in recent years "courts have increasingly recognized that drug quantity is a poor proxy for culpability." *Id.*

In that regard, other indicators such as the "offender's role in the crime is more useful for determining culpability than the quantity of drugs." *Johnson*, 379 F. Supp. 3d at 1220. In that regard, "managers and leaders of a drug organization actively plan the organization's activities, plot to increase its profits, and recruit its members. Consequently, they are more likely to initiate drug-related crimes and increase their scale. A low-level dealer or courier, by contrast, is easily replaceable and does little to advance the overall drug organization." *Id.* at 1220-21. "The bottom line is that drug quantity does not always correspond with a defendant's role or culpability, and this problem is not sufficiently offset by the Guidelines' downward adjustments for mitigating roles." *Johnson*, 379 F. Supp. 3d at 1221.

As to "**purity**", the guidelines create a scheme which punishes methamphetamine mixture and actual methamphetamine at a 10-to-1 ratio. *Johnson*, 379 F. Supp. 3d at 1223. In essence, this scheme punishes an offender who has possession of purer methamphetamine significantly harsher than a defendant who possesses less pure product. *Id.* "The apparent theory underpinning higher punishments for higher purity methamphetamine is that purity reflects the offender's role in the drug-distribution chain." *Id.* "However, just as courts have criticized the link between drug quantity and the offender's role, they have also debunked the guidelines' assumed connection between drug purity and criminal role." *Id.* at 1223-24.

Recent research illustrates that "today's methamphetamine is substantially pure". *Johnson*, 379 F. Supp. 3d at 1224. In that regard, reports of the DEA indicate that between 2011 and 2016 "the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014 and most recently, for the third quarter of 2016 averaged 93.5 percent pure." *Id.* Given these statistics, it is clear that "the connection between methamphetamine purity and criminal role is divorced from reality." *Id.* Stated differently,

16

"because high-purity methamphetamine is currently available at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations." *Id.*

As applied here, Ms. Bermudez-Torres was involved in transactions to sell methamphetamine in amounts of 90.9 grams mixture (88.17 grams of methamphetamine actual); 168.7 grams mixture (160.2 grams of methamphetamine actual); 164.7 grams mixture (149.8 grams of methamphetamine actual); 170.6 grams mixture (162.2 grams of methamphetamine actual); 27.8 grams mixture (28.8 grams of actual methamphetamine); and 139.5 grams mixture (132.5 grams actual methamphetamine). In total, in the PSR, 887.07 grams of methamphetamine actual (not mixture) were assessed to Ms. Bermudez-Torres. [DE84 ¶ 38].

Ms. Bermudez-Torres was assessed a base offense level of 34 under U.S.S.G. § 2D1.1(a)(5), (c)(3), accordingly for distributing at least 500 grams but less than 1.5 kilograms of methamphetamine actual. [DE84 ¶ 48]. Had Ms. Bermudez-Torres been sentenced under the methamphetamine *mixture* provision, for the same corresponding amount of substance, her base offense level would be 30 under U.S.S.G. § 2D1.1(c)(5). With her three-point reduction based on U.S.S.G. § 3E1.1(a) and (b), her total offense level would be 27, which would **reduce her sentencing range** from 151 to 188 months down **to 100 to 125 months**, before any additional variance or departure. Ms. Bermudez submits that this Court can vary to the above-stated range, based on its disagreement with the purity assessment, and can further reduce her sentence based on the established-fact that *quantity* is a poor indicator of severity.

17

## VI. TWO LEVEL REDUCTION UNDER U.S.S.G. § 2D1.1(b)(18)[2]

U.S.S.G. § 2D1.1 provides that "If the defendant meets the criteria set forth in subdivisions (1) – (5) of subsection (a) of § 5C1.2, decrease [the offense level] by 2 levels." *See* U.S.S.G. § 2D1.1(b)(18) (2023). As of February 2, 2023, proposed amendments to U.S.S.G. § 5C1.2 would "reflect [a] broader class of defendants who are eligible for safety valve relief" under the Act. *See* PROPOSED AMENDMENTS, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230201_RF-proposed.pdf (last visited Sept. 25, 2023). As iterated by the author of the PSR "[the] Court may consider a downward variance under 18 U.S.C. § 3553 to reflect a two-level reduction to the defendant's total offense level pursuant to § 2D1.1(b)(18), the proposed amendment to § 5C1.2, and current 11th Circuit case law." [DE84 ¶ 111].

The PSR [DE 84] agrees that under the proposed amendment, Ms. Bermudez-Torres would qualify for an additional two-point reduction in base offense level, and as such, Ms. Bermudez-Torres respectfully requests this Court consider that fact in varying downward from the stated guideline range. *See e.g., United States v. Miranda-Garcia*, 417 Fed. Appx. 895 (11th Cir. 2011) (recognizing that a court has "discretion" to vary from the guidelines based on a "proposed amendment" which was not yet adopted at the time of sentencing).

---

[2] In the presentence investigation report, the author likewise recommended a variance pursuant to U.S.S.G. § 2D1.1(b)(18). [DE84 ¶ 111]. With this two-level reduction applied, the total offense level is 29, and the associated stated guideline range is between **121 and 151 months**. [DE84 ¶ 111]. Ms. Bermudez-Torres submits that with the adjustment for *quality* of methamphetamine, which reduces her base level to 30 (135-168 months in a category IV criminal history), and reducing her base level by three points pursuant to U.S.S.G. § 3E1.1(a) and (b), which reduces her base level of 27 (100-125 months in a category IV criminal history), and reducing her base level by an additional two points under § 2D1.1(b)(18), which reduces her based level to 25: her stated base level, prior to any additional departure of variance should be assessed at: **84-105 months** in a category IV criminal history.

**CONCLUSION**

WHEREFORE, Ms. Bermudez-Torres Respectfully Requests this Honorable Court: (1) <u>grant</u> this motion, to the extent it seeks a variance from the stated guideline range [151 months to 188 months]; (2) specifically <u>find</u> that the methamphetamine guidelines arbitrarily emphasize *purity* and *quantity*, and accordingly reduce the base offense level from 34 (as calculated utilizing the "pure" methamphetamine guideline) to 30 (as calculated utilizing the "mixture" methamphetamine guideline); and (3) specifically <u>find</u> that accounting for acceptance of responsibility reduction under U.S.S.G. § 3E1.1(a) and (b) the base offense level should be reduced to 27; and (4) specifically <u>find</u> that accounting for the proposed amendments to U.S.S.G. § 5C1.2, Ms. Bermudez-Torres, the court in its discretion will afford an additional two level reduction, which reduces the base offense level to 25; and (5) <u>vary</u> from the new stated guideline range of 84-105 months [base offense level of 25 with category IV criminal history] to the degree necessary to reflect the nature of the offense, characteristics of the offender, and applicable policy statements of the Sentencing Commission, pursuant to 18 U.S.C. § 3553(a); U.S.S.G. § 5H1.6 (2023); and § 5H1.3 (2023); and (6) <u>order</u> that, to the extent Ms. Bermudez-Torres is eligible she shall be permitted to take part in the Residential Drug Abuse Program and BOP's evidence based recidivism reduction program; and (7) <u>grant</u> any other relief deemed just and necessary under the circumstances.

Respectfully Submitted,

By: *Richard A. Merlino*
Richard A. Merlino, Esq.
Florida Bar # 977640
**RICHARD A. MERLINO, P.A.,**
101 N.E. 3rd Ave., Suite 1500
Fort Lauderdale, Florida 33301
Tel: (954)467-8989
E: richmerlinoesq@gmail.com

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading has been electronically filed and served via EM/ECF on this 28th day of September 2023.

By: *Richard A. Merlino*
Richard A. Merlino, Esq.